Derek KITCHEN, Moudi Sbeity, Karen Archer, Kate Call, Laurie Wood, and Kody Partridge, Plaintiffs,

v.

Gary R. HERBERT, John Swallow, and Sherrie Swensen, Defendants.

Case No. 2:13–cv–217.

United States District Court, D. Utah, Central Division.

Dec. 20, 2013.

Peggy A. Tomsic, James E. Magleby, Jennifer F. Parrish, Magleby & Greenwood PC, Salt Lake City, UT, for Plaintiffs.

Stanford Edward Purser, Utah Attorney General's Office, Philip S. Lott, Salt Lake City, UT, for Defendants.

## MEMORANDUM DECISION AND ORDER

ROBERT J. SHELBY, District Judge.

The Plaintiffs in this lawsuit are three gay and lesbian couples who wish to marry, but are currently unable to do so because the Utah Constitution prohibits same-sex marriage. The Plaintiffs argue that this prohibition infringes their rights to due process and equal protection under the Fourteenth Amendment of the United States Constitution. The State of Utah defends its laws and maintains that a state has the right to define marriage according to the judgment of its citizens. Both parties have submitted motions for summary judgment.

The court agrees with Utah that regulation of marriage has traditionally been the province of the states, and remains so today. But any regulation adopted by a state, whether related to marriage or any other interest, must comply with the Constitution of the United States. The issue the court must address in this case is therefore not who should define marriage, but the narrow question of whether Utah's current definition of marriage is permissible under the Constitution.

Few questions are as politically charged in the current climate. This observation is especially true where, as here, the state electorate has taken democratic action to participate in a popular referendum on this issue. It is only under exceptional circumstances that a court interferes with such action. But the legal issues presented in this lawsuit do not depend on whether Utah's laws were the result of its legislature or a referendum, or whether the laws passed by the widest or smallest of margins. The question presented here depends instead on the Constitution itself, and on the interpretation of that document contained in binding precedent from the Supreme Court and the Tenth Circuit Court of Appeals.

Applying the law as it is required to do, the court holds that Utah's prohibition on same-sex marriage conflicts with the United States Constitution's guarantees of equal protection and due process under the law. The State's current laws deny its gay and lesbian citizens their fundamental right to marry and, in so doing, demean the dignity of these same-sex couples for no rational reason. Accordingly, the court finds that these laws are unconstitutional.

## BACKGROUND

### I. The Plaintiffs

The three couples in this lawsuit either desire to be married in Utah or are already legally married elsewhere and wish to have their marriage recognized in Utah. The court summarizes below the relevant facts from the affidavits that the couples filed in support of their Motion for Summary Judgment.

#### A. *Derek Kitchen and Moudi Sbeity*

Derek Kitchen is a twenty-five-year-old man who was raised in Utah and obtained a B.A. in political science from the University of Utah. Moudi Sbeity is also twenty-five years old and was born in Houston, Texas. He grew up in Lebanon, but left that country in 2006 during the war between Lebanon and Israel. Moudi came to Logan, Utah, where he received a B.S. in economics from Utah State University. He is currently enrolled in a Master's program in economics at the University of Utah.

Derek testifies that he knew he was gay from a young age, but that he did not come out publicly to his friends and family for several years while he struggled to define his identity. Moudi also knew he was gay when he was young and came out to his mother when he was sixteen. Moudi's mother took him to a psychiatrist because she thought he was confused, but the psychiatrist told her that there was nothing wrong with Moudi. After that visit, Moudi's mother found it easier to accept Moudi's identity, and Moudi began telling his other friends and family members. Moudi testifies that he was careful about whom he told because he was concerned that he might expose his mother to ridicule.

Derek and Moudi met each other in 2009 and fell in love shortly after meeting. After dating for eighteen months, the two moved in together in Salt Lake City. Derek and Moudi run a business called "Laziz" that they jointly started. Laziz produces and sells Middle Eastern spreads such as hummus, muhammara, and toum to Utah businesses like Harmon's and the Avenues Bistro. Having maintained a committed relationship for over four years, Derek and Moudi desire to marry each other. They were denied a marriage license from the Salt Lake County Clerk's office in March 2013.

#### B. *Karen Archer and Kate Call*

Karen Archer was born in Maryland in 1946, but spent most of her life in Boulder,

Colorado. She received a B.A. and an M.D. from the University of Texas, after which she completed her residency in OB/GYN at the Pennsylvania State University. She worked as a doctor until 2001, when she retired after developing two serious illnesses. Karen experienced a number of hardships due to her sexual identity. Karen came out to her parents when she was twenty-six years old, but her parents believed that her sexual orientation was an abnormality and never accepted this aspect of Karen's identity. Karen was one of thirteen women in a medical school class of 350, and she recalls that her male classmates often referred to the female students as "dykes." Karen also testifies that she was once present at a gay bar when it was raided by the police, who assaulted the bar patrons with their batons.

Kate Call is sixty years old and spent her earliest years in Wisconsin and Mexico, where her parents were mission presidents for the Church of Jesus Christ of Latter-day Saints. When she was eight years old, Kate moved to Provo, Utah, where her father worked as a professor at Brigham Young University. Kate received her B.A. from BYU in 1974. While she was in college, she dated several men and was even engaged twice. Although she hoped that she would begin to feel a more intimate connection if she committed herself to marriage, she broke off both engagements because she never developed any physical attraction to her fiancés. Kate began to realize that she was a lesbian, a feeling that continued to develop while she was serving a mission in Argentina. She wrote a letter sharing these feelings to her mission president, who, without Kate's consent, faxed Kate's message to church authorities and her parents. Kate's family was sad and puzzled at first, but ultimately told her that they loved her unconditionally.

During her professional life, Kate owned a number of businesses. In 2000, she bought a sheep ranch in San Juan County and moved there with D., her partner at the time. Kate worked seasonally for the National Park Service and D. found a job at the Youth Detention facility in Blanding. But when rumors surfaced that D. was a lesbian, D.'s boss told her that she needed to move away from Kate's ranch if she wished to keep her job. While Kate was helping D. move, someone from D.'s work saw Kate's vehicle at D.'s new trailer. That person reported the sighting to D.'s boss, and D. was fired. Several weeks later, Kate's supervisor also told her that her services were no longer needed. Kate never found out why she was let go, but she surmises that her supervisor may have been pressured by D.'s boss, who was one of her supervisor's mentors. Kate and D. moved back to the Wasatch Front, and Kate was eventually forced to sell the ranch. Kate testifies that she and D. split up as a result of the difficult challenges they had faced, and Kate eventually moved to Moab.

Karen and Kate met online through a dating website and were immediately attracted to each other when they first met in person. Karen moved from Colorado to Utah, and the couple now lives in Wallsburg. The two are both concerned about how they will support each other in the event that one of them passes away, a consideration that is especially urgent in light of Karen's illness. Karen has had difficult experiences with the legal aspects of protecting a same-sex union in the past. Before meeting Kate, Karen had two partners who passed away while she was with them. While partnered to a woman named Diana, Karen had to pay an attorney approximately one thousand dollars to draw up a large number of legal documents to guarantee certain rights: emergency contacts, visitation rights, power of

attorney for medical and financial decisions, medical directives, living wills, insurance beneficiaries, and last wills and testaments. Despite these documents, Karen was unable to receive Diana's military pension when Diana died in 2005.

Karen and Kate have drawn up similar legal papers, but they are concerned that these papers may be subject to challenges because they are not legally recognized as a couple in Utah. In an attempt to protect themselves further, Karen and Kate flew to Iowa to be wed in a city courthouse. Because of the cost of the plane tickets, the couple was not able to have friends and family attend, and the pair had their suitcases by their side when they said, "I do." Kate testifies that the pragmatism of their Iowa wedding was born out of the necessity of providing whatever security they could for their relationship. Under current law, Utah does not recognize their marriage performed in Iowa.

### C. Laurie Wood and Kody Partridge

Laurie Wood has lived in Utah since she was three years old. She grew up in American Fork, received a B.A. from the University of Utah, and received her Master's degree from BYU. She spent over eleven years teaching in the public school system in Utah County and is now employed by Utah Valley University. She teaches undergraduate courses as an Associate Professor of English in the English and Literature Department, and also works as the Concurrent Enrollment Coordinator supervising high school instructors who teach as UVU adjuncts in high schools across Utah County. She has served on the Board of Directors for the American Civil Liberties Union for fifteen years and co-founded the non-profit Women's Redrock Music Festival in 2006. Laurie was not open about her sexual identity while she was a public school teacher because she believed she would be fired if she said anything. She came out when she was hired at UVU. While she dated men in high school and college, she never felt comfortable or authentic in her relationships until she began dating women.

Kody Partridge is forty-seven years old and moved to Utah from Montana in 1984 to attend BYU. She received her B.A. in Spanish and humanities and later obtained a Master's degree in English. She earned a teaching certificate in 1998 and began teaching at Butler Middle School in Salt Lake County. She realized that she was a lesbian while she was in college, and her family eventually came to accept her identity. She did not feel she could be open about her identity at work because of the worry that her job would be at risk. While she was teaching at Butler, Kody recalls that the story of Wendy Weaver was often in the news. Ms. Weaver was a teacher and coach at a Utah public school who was fired because she was a lesbian. Kody also became aware that the pension she was building in Utah Retirement Systems as a result of her teaching career could not be inherited by a life partner. Given these concerns, Kody applied and was accepted for a position in the English department at Rowland Hall–St. Mark's, a private school that provides benefits for the same-sex partners of its faculty members. Kody volunteers with the Utah AIDS Foundation and has traveled with her students to New Orleans four times after Hurricane Katrina to help build homes with Habitat for Humanity.

Laurie and Kody met and fell in love in 2010. Besides the fact that they are both English teachers, the two share an interest in books and gardening and have the same long-term goals for their committed relationship. They wish to marry, but were denied a marriage license from the Salt Lake County Clerk's office in March 2013.

## II. History of Amendment 3

The Utah laws that are at issue in this lawsuit include two statutory prohibitions on same-sex unions and an amendment to the Utah Constitution. The court discusses the history of these laws in the context of the ongoing national debate surrounding same-sex marriage.

In 1977, the Utah legislature amended Section 30–1–2 of the Utah Code to state that marriages "between persons of the same sex" were "prohibited and declared void." In 2004, the Utah legislature passed Section 30–1–4.1 of the Utah Code, which provides:

> (1) (a) It is the policy of this state to recognize as marriage only the legal union of a man and a woman as provided in this chapter.
>
> (b) Except for the relationship of marriage between a man and a woman recognized pursuant to this chapter, this state will not recognize, enforce, or give legal effect to any law creating any legal status, rights, benefits, or duties that are substantially equivalent to those provided under Utah law to a man and woman because they are married.

In the 2004 General Session, the Utah legislature also passed a Joint Resolution on Marriage, which directed the Lieutenant Governor to submit the following proposed amendment to the Utah Constitution to the voters of Utah:

> (1) Marriage consists only of the legal union between a man and a woman.
>
> (2) No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect.

Laws 2004, H.J.R. 25 § 1. The proposed amendment, which became known as Amendment 3, was placed on the ballot for the general election on November 2, 2004. Amendment 3 passed with the support of approximately 66% of the voters. The language in Amendment 3 was then amended to the Utah Constitution as Article I, § 29, which went into effect on January 1, 2005.[1]

These developments were influenced by a number of events occurring nationally. In 1993, the Hawaii Supreme Court found that the State of Hawaii's refusal to grant same-sex couples marriage licenses was discriminatory. *Baehr v. Lewin*, 74 Haw. 530, 852 P.2d 44, 59 (1993).[2] And in 1999, the Vermont Supreme Court held that the State of Vermont was required to offer all the benefits of marriage to same-sex couples. *Baker v. Vermont*, 170 Vt. 194, 744 A.2d 864, 886–87 (1999).[3] Two court cases in 2003 immediately preceded Utah's decision to amend its Constitution. First, the United States Supreme Court ruled that

---

1. Unless noted otherwise, the court will refer to Amendment 3 in this opinion to mean both the Utah constitutional amendment and the Utah statutory provisions that prohibit same-sex marriage.

2. The Hawaii Supreme Court remanded the case to the trial court to determine if the state could show that its marriage statute was narrowly drawn to further compelling state interests. *Baehr*, 852 P.2d at 68. The trial court ruled that the government failed to make this showing. *Baehr v. Miike*, No. 91–1394, 1996 WL 694235, at *22 (Haw.Cir.Ct. Dec. 3, 1996). The trial court's decision was rendered moot after Hawaii passed a constitutional amendment that granted the Hawaii legislature the ability to reserve marriage for opposite-sex couples. Recently, the legislature reversed course and legalized same-sex marriage. Same-sex couples began marrying in Hawaii on December 2, 2013.

3. The Vermont legislature complied with this mandate by creating a new legal status called a "civil union." The legislature later permitted same-sex marriage through a statute that went into effect on September 1, 2009.

the Due Process Clause of the Fourteenth Amendment protected the sexual relations of gay men and lesbians. *Lawrence v. Texas,* 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). Second, the Supreme Court of Massachusetts ruled that the Massachusetts Constitution protected the right of same-sex couples to marry. *Goodridge v. Dep't of Pub. Health,* 440 Mass. 309, 798 N.E.2d 941, 948 (2003).

Since 2003, every other state has either legalized same-sex marriage [4] or, like Utah, passed a constitutional amendment or other legislation to prohibit same-sex unions. During the past two decades, the federal government has also been involved in the same-sex marriage debate. In 1996, Congress passed the Defense of Marriage Act (DOMA), which allowed states to refuse to recognize same-sex marriages granted in other states and barred federal recognition of same-sex unions for the purposes of federal law. Act of Sept. 21, 1996, Pub.L. 104–199, 110 Stat. 2419. In 2013, the Supreme Court held that Section 3 of DOMA was unconstitutional.[5] *United States v. Windsor,* — U.S. —, 133 S.Ct. 2675, 2696, 186 L.Ed.2d 808 (2013).

The Supreme Court also considered an appeal from a case involving California's Proposition 8. After the California Supreme Court held that the California Constitution recognized same-sex marriage, *In re Marriage Cases,* 43 Cal.4th 757, 76 Cal. Rptr.3d 683, 183 P.3d 384, 453 (2008), California voters passed Proposition 8, which amended California's Constitution to pro-

hibit same-sex marriage. The Honorable Vaughn Walker, a federal district judge, determined that Proposition 8 violated the guarantees of equal protection and due process under the United States Constitution. *Perry v. Schwarzenegger,* 704 F.Supp.2d 921, 1003 (N.D.Cal.2010). Applying different reasoning, the Ninth Circuit Court of Appeals affirmed Judge Walker's holding that Proposition 8 was unconstitutional. *Perry v. Brown,* 671 F.3d 1052, 1095 (9th Cir.2012). This issue was appealed to the Supreme Court, but the Court did not address the merits of the question presented. *Hollingsworth v. Perry,* — U.S. —, 133 S.Ct. 2652, 2668, 186 L.Ed.2d 768 (2013). Instead, the Court found that the proponents of Proposition 8 did not have standing to appeal Judge Walker's decision after California officials refused to defend the law. *Id.* Consequently, the Supreme Court vacated the Ninth Circuit's opinion for lack of jurisdiction. *Id.* A number of lawsuits, including the suit currently pending before this court, have been filed across the country to address the question that the Supreme Court left unanswered in the California case. The court turns to that question now.

## ANALYSIS

### I. Standard of Review

The court grants summary judgment when "there is no genuine dispute as to

---

4. Six states have legalized same-sex marriage through court decisions (California, Connecticut, Iowa, Massachusetts, New Jersey, New Mexico); eight states have passed same-sex marriage legislation (Delaware, Hawaii, Illinois, Minnesota, New Hampshire, New York, Rhode Island, Vermont); and three states have legalized same-sex marriage through a popular vote (Maine, Maryland, Washington). Same-sex marriage is also legal in Washington, D.C.

5. As discussed below, Section 3 defined marriage as the union between a man and a woman for purposes of federal law. The Court did not consider a challenge to Section 2, which allows states to refuse to recognize same-sex marriages validly performed in other states. *See* 28 U.S.C. § 1738C.

any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party." *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir.2008).

## II. Effect of the Supreme Court's Decision in *United States v. Windsor*

The court begins its analysis by determining the effect of the Supreme Court's recent decision in *United States v. Windsor*, — U.S. ——, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013). In *Windsor*, the Court considered the constitutionality of Section 3 of DOMA, which defined marriage as the "legal union between one man and one woman as husband and wife" for the purposes of federal law. 1 U.S.C. § 7 (2012). A majority of the Court found that this statute was unconstitutional because it violated the Fifth Amendment of the United States Constitution. *Windsor*, 133 S.Ct. at 2696.

Both parties argue that the reasoning in *Windsor* requires judgment in their favor. The State focuses on the portions of the *Windsor* opinion that emphasize federalism, as well as the Court's acknowledgment of the State's "historic and essential authority to define the marital relation." *Id.* at 2692; *see also id.* at 2691 ("[S]ubject to [constitutional] guarantees, 'regulation of domestic relations' is 'an area that has long been regarded as a virtually exclusive province of the States.'" (quoting *Sosna v. Iowa*, 419 U.S. 393, 404, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975))). The State interprets *Windsor* to stand for the proposition that DOMA was unconstitutional because the statute departed from the federal government's "history and tradition of reliance on state law to define marriage." *Id.* at 2692. Just as the federal government cannot choose to disregard a state's decision to recognize same-sex marriage, Utah asserts that the federal government cannot intrude upon a state's decision *not* to recognize same-sex marriage. In other words, Utah believes that it is up to each individual state to decide whether two persons of the same sex may "occupy the same status and dignity as that of a man and woman in lawful marriage." *Id.* at 2689.

The Plaintiffs disagree with this interpretation and point out that the *Windsor* Court did not base its decision on the Tenth Amendment.[6] Instead, the Court grounded its holding in the Due Process Clause of the Fifth Amendment, which protects an individual's right to liberty. *Id.* at 2695 ("DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution."). The Court found that DOMA violated the Fifth Amendment because the statute "place[d] same-sex couples in an unstable position of being in a second-tier marriage," a differentiation that "demean[ed] the couple, whose moral and sexual choices the Constitution protects[.]" *Id.* at 2694. The Plaintiffs argue that for the same reasons the Fifth Amendment prohibits the federal government from differentiating between same-sex and opposite-sex couples, the Fourteenth Amendment prohibits state governments from making this distinction.

Both parties present compelling arguments, and the protection of states' rights and individual rights are both weighty concerns. In *Windsor*, these interests were

---

6. The Tenth Amendment makes explicit the division between federal and state power: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

allied against the ability of the federal government to disregard a state law that protected individual rights. Here, these interests directly oppose each other. The *Windsor* court did not resolve this conflict in the context of state-law prohibitions of same-sex marriage. *See id.* at 2696 (Roberts, C.J., dissenting) ("The Court does not have before it ... the distinct question whether the States ... may continue to utilize the traditional definition of marriage."). But the Supreme Court has considered analogous questions that involve the tension between these two values in other cases. *See, e.g., Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (balancing the state's right to regulate marriage against the individual's right to equal protection and due process under the law). In these cases, the Court has held that the Fourteenth Amendment requires that individual rights take precedence over states' rights where these two interests are in conflict. *See id.* at 7, 87 S.Ct. 1817 (holding that a state's power to regulate marriage is limited by the Fourteenth Amendment).

The Constitution's protection of the individual rights of gay and lesbian citizens is equally dispositive whether this protection requires a court to respect a state law, as in *Windsor,* or strike down a state law, as the Plaintiffs ask the court to do here. In his dissenting opinion, the Honorable Antonin Scalia recognized that this result was the logical outcome of the Court's ruling in *Windsor:*

> In my opinion, however, the view that *this* Court will take of state prohibition of same-sex marriage is indicated beyond mistaking by today's opinion. As I have said, the real rationale of today's opinion ... is that DOMA is motivated by "bare ... desire to harm" couples in same-sex marriages. How easy it is, indeed how inevitable, to reach the same

conclusion with regard to state laws denying same-sex couples marital status. 133 S.Ct. at 2709 (citations and internal quotation marks omitted). The court agrees with Justice Scalia's interpretation of *Windsor* and finds that the important federalism concerns at issue here are nevertheless insufficient to save a state-law prohibition that denies the Plaintiffs their rights to due process and equal protection under the law.

## III. *Baker v. Nelson* Is No Longer Controlling Precedent

In 1971, two men from Minnesota brought a lawsuit in state court arguing that Minnesota was constitutionally required to allow them to marry. *Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185, 187 (1971). The Minnesota Supreme Court found that Minnesota's restriction of marriage to opposite-sex couples did not violate either the Equal Protection Clause or the Due Process Clause of the Fourteenth Amendment. *Id.* at 186–87. On appeal, the United States Supreme Court summarily dismissed the case "for want of a substantial federal question." *Baker v. Nelson,* 409 U.S. 810, 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972).

Utah argues that the Court's summary dismissal in *Baker* is binding on this court and that the present lawsuit should therefore be dismissed for lack of a substantial federal question. But the Supreme Court has stated that a summary dismissal is not binding "when doctrinal developments indicate otherwise." *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975).

■ Here, several doctrinal developments in the Court's analysis of both the Equal Protection Clause and the Due Process Clause as they apply to gay men and lesbians demonstrate that the Court's summary dismissal in *Baker* has little if any

precedential effect today. Not only was *Baker* decided before the Supreme Court held that sex is a quasi-suspect classification, *see Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Frontiero v. Richardson,* 411 U.S. 677, 688, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality op.), but also before the Court recognized that the Constitution protects individuals from discrimination on the basis of sexual orientation. *See Romer v. Evans,* 517 U.S. 620, 635–36, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Moreover, *Baker* was decided before the Supreme Court held in *Lawrence v. Texas* that it was unconstitutional for a state to "demean [the] existence [of gay men and lesbians] or control their destiny by making their private sexual conduct a crime." 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). As discussed below, the Supreme Court's decision in *Lawrence* removes a justification that states could formerly cite as a reason to prohibit same-sex marriage.

The State points out that, despite the doctrinal developments in these cases and others, a number of courts have found that *Baker* survives as controlling precedent and therefore precludes consideration of the issues in this lawsuit. *See, e.g., Massachusetts v. U.S. Dep't of Health & Human Servs.,* 682 F.3d 1, 8 (1st Cir.2012) (holding that *Baker* "limit[s] the arguments to ones that do not presume to rest on a constitutional right to same-sex marriage."); *Sevcik v. Sandoval,* 911 F.Supp.2d 996, 1002–03 (D.Nev.2012) (ruling that *Baker* barred the plaintiffs' equal protection claim). Other courts disagree and have decided substantially similar issues without consideration of *Baker. See, e.g., Perry v. Schwarzenegger,* 704 F.Supp.2d 921 (N.D.Cal.2010) (ruling that California's prohibition of same-sex marriage violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment). In any event, all of these cases were decided before the Supreme Court issued its opinion in *Windsor.*

As discussed above, the Court's decision in *Windsor* does not answer the question presented here, but its reasoning is nevertheless highly relevant and is therefore a significant doctrinal development. Importantly, the *Windsor* Court foresaw that its ruling would precede a number of lawsuits in state and lower federal courts raising the question of a state's ability to prohibit same-sex marriage, a fact that was noted by two dissenting justices. The Honorable John Roberts wrote that the Court "may in the future have to resolve challenges to state marriage definitions affecting same-sex couples." *Windsor,* 133 S.Ct. at 2697 (Roberts, C.J., dissenting). And Justice Scalia even recommended how this court should interpret the *Windsor* decision when presented with the question that is now before it: "I do not mean to suggest disagreement ... that lower federal courts and state courts can distinguish today's case when the issue before them is state denial of marital status to same-sex couples." *Id.* at 2709 (Scalia, J., dissenting). It is also notable that while the Court declined to reach the merits in *Hollingsworth v. Perry* because the petitioners lacked standing to pursue the appeal, the Court did not dismiss the case outright for lack of a substantial federal question. *See* —— U.S. ——, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013). Given the Supreme Court's disposition of both *Windsor* and *Perry,* the court finds that there is no longer any doubt that the issue currently before the court in this lawsuit presents a substantial question of federal law.

As a result, *Baker v. Nelson* is no longer controlling precedent and the court proceeds to address the merits of the question presented here.

## IV. Amendment 3 Violates the Plaintiffs' Due Process Rights

 The State of Utah contends that what is at stake in this lawsuit is the State's right to define marriage free from federal interference. The Plaintiffs counter that what is really at issue is an individual's ability to protect his or her fundamental rights from unreasonable interference by the state government. As discussed above, the parties have defined the two important principles that are in tension in this matter. While Utah exercises the "unquestioned authority" to regulate and define marriage, *Windsor*, 133 S.Ct. at 2693, it must nevertheless do so in a way that does not infringe the constitutional rights of its citizens. *See id.* at 2692 (noting that the "incidents, benefits, and obligations of marriage" may vary from state to state but are still "subject to constitutional guarantees"). As a result, the court's role is not to define marriage, an exercise that would be improper given the states' primary authority in this realm. Instead, the court's analysis is restricted to a determination of what individual rights are protected by the Constitution. The court must then decide whether the State's definition and regulation of marriage impermissibly infringes those rights.

 The Constitution guarantees that all citizens have certain fundamental rights. These rights vest in every person over whom the Constitution has authority and, because they are so important, an individual's fundamental rights "may not be submitted to vote; they depend on the outcome of no elections." *W.Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). When the Constitution was first ratified, these rights were specifically articulated in the Bill of Rights and protected an individual from certain actions of the federal government. After the nation's wrenching experience in the Civil War, the people adopted the Fourteenth Amendment, which holds: "No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment applies to "matters of substantive law as well as to matters of procedure. Thus all fundamental rights comprised within the term liberty are protected by the Federal constitution from invasion by the States." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (quoting *Whitney v. California*, 274 U.S. 357, 373, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring)).

The most familiar of an individual's substantive liberties are those recognized by the Bill of Rights, and the Supreme Court has held that the Due Process Clause of the Fourteenth Amendment incorporates most portions of the Bill of Rights against the States. *See, e.g., Duncan v. Louisiana*, 391 U.S. 145, 147–48, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (discussing incorporation of certain rights from the First, Fourth, Fifth, and Sixth Amendments); *McDonald v. City of Chicago*, —— U.S. ——, 130 S.Ct. 3020, 3050, 177 L.Ed.2d 894 (2010) (incorporating the Second Amendment). In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the Supreme Court recognized the authority of an argument first made by the Honorable John Marshall Harlan II that the Due Process Clause also protects a number of unenumerated rights from unreasonable invasion by the State:

[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, ... and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgement.

*Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting from dismissal on jurisdictional grounds), *quoted in Casey,* 505 U.S. at 848–49, 112 S.Ct. 2791.

A. *Supreme Court Cases Protecting Marriage as a Fundamental Right*

▮ The right to marry is an example of a fundamental right that is not mentioned explicitly in the text of the Constitution but is nevertheless protected by the guarantee of liberty under the Due Process Clause. The Supreme Court has long emphasized that the right to marry is of fundamental importance. In *Maynard v. Hill,* the Court characterized marriage as "the most important relation in life" and as "the foundation of the family and society, without which there would be neither civilization nor progress." 125 U.S. 190, 205, 211, 8 S.Ct. 723, 31 L.Ed. 654 (1888). In *Meyer v. Nebraska,* the Court recognized that the right "to marry, establish a home and bring up children" is a central part of the liberty protected by the Due Process Clause. 262 U.S. 390, 399, 43 S.Ct. 625, 67

L.Ed. 1042 (1923). And in *Skinner v. Oklahoma ex rel. Williamson,* the Court ruled that marriage is "one of the basic civil rights of man." 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

In more recent cases, the Court has held that the right to marry implicates additional rights that are protected by the Fourteenth Amendment. For instance, the Court's decision in *Griswold v. Connecticut,* in which the Court struck down a Connecticut law that prohibited the use of contraceptives, established that the right to marry is intertwined with an individual's right of privacy. The Court observed:

We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.

381 U.S. 479, 486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). And in *M.L.B. v. S.L.J.,* the Court described marriage as an associational right: "Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked 'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (citation omitted).

The Supreme Court has consistently held that a person must be free to make personal decisions related to marriage without unjustified government interference. *See, e.g., Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct.

791, 39 L.Ed.2d 52 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."); *Carey v. Population Servs. Int'l,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) ("[I]t is clear that among the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education." (citations and internal quotation marks omitted)); *Hodgson v. Minnesota,* 497 U.S. 417, 435, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) ("But the regulation of constitutionally protected decisions, such as where a person shall reside or whom he or she shall marry, must be predicated on legitimate state concerns other than disagreement with the choice the individual has made."). In *Planned Parenthood of Southeastern Pennsylvania v. Casey,* the Court emphasized the high degree of constitutional protection afforded to an individual's personal choices about marriage and other intimate decisions:

> These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

*Casey,* 505 U.S. at 851, 112 S.Ct. 2791.

Given the importance of marriage as a fundamental right and its relation to an individual's rights to liberty, privacy, and association, the Supreme Court has not hesitated to invalidate state laws pertaining to marriage whenever such a law intrudes on an individual's protected realm of liberty. Most famously, the Court struck down Virginia's law against interracial marriage in *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). The Court found that Virginia's anti-miscegenation statute violated both the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. *Id.* The Court has since noted that *Loving* was correctly decided, even though mixed-race marriages had previously been illegal in many states[7] and, moreover, were not specifically protected from government interference at the time the Fourteenth Amendment was ratified: "Marriage is mentioned nowhere in the Bill of Rights and interracial marriage was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in *Loving v. Virginia.*" *Casey,* 505 U.S. at 847–48, 112 S.Ct. 2791; *see also Perry v. Schwarzenegger,* 704 F.Supp.2d 921, 992 (N.D.Cal.2010) ("[T]he Court recognized that race restrictions, despite their historical prevalence, stood in stark contrast to the concepts of liberty and choice inherent in the right to marry.").

In addition to the anti-miscegenation laws the Supreme Court struck down in *Loving,* the Supreme Court has held that other state regulations affecting marriage are unconstitutional where these laws infringe on an individual's access to marriage. In *Zablocki v. Redhail,* the Court

---

**7.** In 1948, the California Supreme Court became the first court in the twentieth century to strike down an anti-miscegenation statute.

*Perez v. Sharp,* 32 Cal.2d 711, 198 P.2d 17 (1948); *see also Loving,* 388 U.S. at 6 n. 5, 87 S.Ct. 1817.

considered a Wisconsin statute that required any Wisconsin resident who had children that were not currently in the resident's custody to obtain a court order before the resident was permitted to marry. 434 U.S. 374, 375, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). The statute mandated that the court should not grant permission to marry unless the resident proved that he was in compliance with any support obligation for his out-of-custody children, and could also show that any children covered by such a support order "[were] not then and [were] not likely thereafter to become public charges." *Id.* (quoting Wis. Stat. § 245.10 (1973)). The Court found that, while the State had a legitimate and substantial interest in the welfare of children in Wisconsin, the statute was nevertheless unconstitutional because it was not "closely tailored to effectuate only those interests" and "unnecessarily impinge[d] on the right to marry[.]" *Id.* at 388, 98 S.Ct. 673. The Court distinguished the statute at issue from reasonable state regulations related to marriage that would not require any heightened review:

> By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed.

*Id.* at 386, 98 S.Ct. 673. As the Honorable John Paul Stevens noted in his concurring opinion, "A classification based on marital status is fundamentally different from a classification which determines who may lawfully enter into the marriage relationship." *Id.* at 403–04, 98 S.Ct. 673 (Stevens, J., concurring).

In *Turner v. Safley,* the Court struck down a Missouri regulation that prohibited inmates from marrying unless the prison superintendent approved of the marriage. 482 U.S. 78, 99–100, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The Court held that inmates retained their fundamental right to marry even though they had a reduced expectation of liberty in prison. *Id.* at 96, 107 S.Ct. 2254. The Court emphasized the many attributes of marriage that prisoners could enjoy even if they were not able to have sexual relations:

> First, inmate marriages, like others, are expressions of emotional support and public commitment. These elements are an important and significant aspect of the marital relationship. In addition, many religions recognize marriage as having spiritual significance; for some inmates and their spouses, therefore, the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication. Third, most inmates eventually will be released by parole or commutation, and therefore most inmate marriages are formed in the expectation that they ultimately will be fully consummated. Finally, marital status often is a precondition to the receipt of government benefits (*e.g.,* Social Security benefits), property rights (*e.g.,* tenancy by the entirety, inheritance rights), and other, less tangible benefits (*e.g.,* legitimation of children born out of wedlock). These incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement or the pursuit of legitimate corrections goals.

*Id.* at 95–96, 107 S.Ct. 2254.

■ These cases demonstrate that the Constitution protects an individual's right to marry as an essential part of the right to liberty. The right to marry is inter-

twined with the rights to privacy and intimate association, and an individual's choices related to marriage are protected because they are integral to a person's dignity and autonomy. While states have the authority to regulate marriage, the Supreme Court has struck down several state regulations that impermissibly burdened an individual's ability to exercise the right to marry. With these general observations in mind, the court turns to the specific question of Utah's ability to prohibit same-sex marriage.

### B. Application of the Court's Jurisprudence to Amendment 3

■ The State does not dispute, nor could it, that the Plaintiffs possess the fundamental right to marry that the Supreme Court has protected in the cases cited above. Like all fundamental rights, the right to marry vests in every American citizen. See Zablocki, 434 U.S. at 384, 98 S.Ct. 673 ("Although Loving arose in the context of racial discrimination, prior and subsequent decisions of this Court confirm that the right to marry is of fundamental importance for all individuals."). The State asserts that Amendment 3 does not abridge the Plaintiffs' fundamental right to marry because the Plaintiffs are still at liberty to marry a person of the opposite sex. But this purported liberty is an illusion. The right to marry is not simply the right to become a married person by signing a contract with someone of the opposite sex. If marriages were planned and arranged by the State, for example, these marriages would violate a person's right to marry because such arrangements would infringe an individual's rights to privacy, dignity, and intimate association. A person's choices about marriage implicate the heart of the right to liberty that is protected by the Fourteenth Amendment. See Casey, 505 U.S. at 851, 112 S.Ct. 2791. The State's argument disregards these nu-

merous associated rights because the State focuses on the outward manifestations of the right to marry, and not the inner attributes of marriage that form the core justifications for why the Constitution protects this fundamental human right.

Moreover, the State fails to dispute any of the facts that demonstrate why the Plaintiffs' asserted right to marry someone of the opposite sex is meaningless. The State accepts without contest the Plaintiffs' testimony that they cannot develop the type of intimate bond necessary to sustain a marriage with a person of the opposite sex. The Plaintiffs have not come to this realization lightly, and their recognition of their identity has often risked their family relationships and work opportunities. For instance, Kody and Laurie both worried that they would lose their jobs as English teachers if they were open about their sexual identity. Kate's previous partner did lose her job because she was a lesbian, and Kate may have been let go from her position with the National Park Service for the same reason. Karen's family never accepted her identity, and Moudi testified that he remained cautious about openly discussing his sexuality because he feared that his mother might be ridiculed. The Plaintiffs' testimony supports their assertions that their sexual orientation is an inherent characteristic of their identities.

Forty years ago, these assertions would not have been accepted by a court without dispute. In 1973, the American Psychiatric Association still defined homosexuality as a mental disorder in the Diagnostic and Statistical Manual of Mental Disorders (DSM–II), and leading experts believed that homosexuality was simply a lifestyle choice. With the increased visibility of gay men and lesbians in the past few decades, a wealth of new knowledge about sexuality has upended these previous be-

liefs. Today, the State does not dispute the Plaintiffs' testimony that they have never been able to develop feelings of deep intimacy for a person of the opposite sex, and the State presents no argument or evidence to suggest that the Plaintiffs could change their identity if they desired to do so. Given these undisputed facts, it is clear that if the Plaintiffs are not allowed to marry a partner of the same sex, the Plaintiffs will be forced to remain unmarried. The effect of Amendment 3 is therefore that it denies gay and lesbian citizens of Utah the ability to exercise one of their constitutionally protected rights. The State's prohibition of the Plaintiffs' right to choose a same-sex marriage partner renders their fundamental right to marry as meaningless as if the State recognized the Plaintiffs' right to bear arms but not their right to buy bullets.

While admitting that its prohibition of same-sex marriage harms the Plaintiffs, the State argues that the court's characterization of Amendment 3 is incorrect for three reasons: (1) the Plaintiffs are not qualified to enter into a marriage relationship; (2) the Plaintiffs are seeking a new right, not access to an existing right; and (3) history and tradition have not recognized a right to marry a person of the same sex. The court addresses each of these arguments in turn.

### 1. *The Plaintiffs Are Qualified to Marry*

First, the State contends that same-sex partners do not possess the qualifications to enter into a marriage relationship and are therefore excluded from this right as a definitional matter. As in other states, the purposes of marriage in Utah include "the state recognition and approval of a couple's choice to live with each other, to remain committed to one another and to form a household based on their own feelings about one another[,] and to join in an economic partnership and support one another and any dependents." *Perry v. Schwarzenegger*, 704 F.Supp.2d 921, 961 (N.D.Cal.2010). There is no dispute that the Plaintiffs are able to form a committed relationship with one person to the exclusion of all others. There is also no dispute that the Plaintiffs are capable of raising children within this framework if they choose to do so. The State even salutes "[t]he worthy efforts of same-sex couples to rear children." (Defs.' Mem. in Opp'n, at 46 n. 7, Dkt. 84.) Nevertheless, the State maintains that same-sex couples are distinct from opposite-sex couples because they are not able to naturally reproduce with each other. The State points to Supreme Court cases that have linked the importance of marriage to its relationship to procreation. *See, e.g., Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the race.").

The court does not find the State's argument compelling because, however persuasive the ability to procreate might be in the context of a particular religious perspective, it is not a defining characteristic of conjugal relationships from a legal and constitutional point of view. The State's position demeans the dignity not just of same-sex couples, but of the many opposite-sex couples who are unable to reproduce or who choose not to have children. Under the State's reasoning, a post-menopausal woman or infertile man does not have a fundamental right to marry because she or he does not have the capacity to procreate. This proposition is irreconcilable with the right to liberty that the Constitution guarantees to all citizens.

At oral argument, the State attempted to distinguish post-menopausal women from gay men and lesbians by arguing that

older women were more likely to find themselves in the position of caring for a grandchild or other relative. But the State fails to recognize that many same-sex couples are also in the position of raising a child, perhaps through adoption or surrogacy. The court sees no support for the State's suggestion that same-sex couples are interested only in a "consent-based" approach to marriage, in which marriage focuses on the strong emotional attachment and sexual attraction of the two partners involved. *See Windsor,* 133 S.Ct. at 2718 (Alito, J., dissenting). Like opposite-sex couples, same-sex couples may decide to marry partly or primarily for the benefits and support that marriage can provide to the children the couple is raising or plans to raise. Same-sex couples are just as capable of providing support for future generations as opposite-sex couples, grandparents, or other caregivers. And there is no difference between same-sex couples who choose not to have children and those opposite-sex couples who exercise their constitutionally protected right not to procreate. *See Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

In any event, the State's argument also neglects to consider the number of additional important attributes of marriage that exist besides procreation. As noted above, the Supreme Court has discussed those attributes in the context of marriages between inmates. *Turner v. Safley,* 482 U.S. 78, 95–96, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). While the Supreme Court noted that some inmates might one day be able to consummate their marriages when they were released, the Court found that marriage was important irrespective of its relationship to procreation because it was an expression of emotional support and public commitment, it was spiritually significant, and it provided access to important legal and government benefits. *Id.* These attributes of marriage are as applicable to same-sex couples as they are to opposite-sex couples.

### 2. *The Plaintiffs Seek Access to an Existing Right*

The State's second argument is that the Plaintiffs are really seeking a new right, not access to an existing right. To establish a new fundamental right, the court must determine that the right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if [it] were sacrificed." *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (citations omitted). Because same-sex marriage has only recently been allowed by a number of states, the State argues that an individual's right to marry someone of the same sex cannot be a fundamental right. But the Supreme Court did not adopt this line of reasoning in the analogous case of *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). Instead of declaring a new right to interracial marriage, the Court held that individuals could not be restricted from exercising their existing right to marry on account of the race of their chosen partner. *Id.* at 12, 87 S.Ct. 1817. Similarly, the Plaintiffs here do not seek a new right to same-sex marriage, but instead ask the court to hold that the State cannot prohibit them from exercising their existing right to marry on account of the sex of their chosen partner.

The alleged right to same-sex marriage that the State claims the Plaintiffs are seeking is simply the same right that is currently enjoyed by heterosexual individuals: the right to make a public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and sustain-

ing emotional bond. This right is deeply rooted in the nation's history and implicit in the concept of ordered liberty because it protects an individual's ability to make deeply personal choices about love and family free from government interference. And, as discussed above, this right is enjoyed by all individuals. If the right to same-sex marriage were a new right, then it should make new protections and benefits available to all citizens. But heterosexual individuals are as likely to exercise their purported right to same-sex marriage as gay men and lesbians are to exercise their purported right to opposite-sex marriage. Both same-sex and opposite-sex marriage are therefore simply manifestations of one right—the right to marry—applied to people with different sexual identities.

While it was assumed until recently that a person could only share an intimate emotional bond and develop a family with a person of the opposite sex, the realization that this assumption is false does not change the underlying right. It merely changes the result when the court applies that right to the facts before it. Applying that right to these Plaintiffs, the court finds that the Constitution protects their right to marry a person of the same sex to the same degree that the Constitution protects the right of heterosexual individuals to marry a person of the opposite sex.

Because the right to marry has already been established as a fundamental right, the court finds that the *Glucksberg* analysis is inapplicable here. The Plaintiffs are seeking access to an existing right, not the declaration of a new right.

3. *Tradition and History Are Insufficient Reasons to Deny Fundamental Rights to an Individual.*

Finally, the State contends that the fundamental right to marriage cannot encompass the right to marry

someone of the same sex because this right has never been interpreted to have this meaning in the past. The court is not persuaded by the State's argument. The Constitution is not so rigid that it always mandates the same outcome even when its principles operate on a new set of facts that were previously unknown:

> Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us ·to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.

*Lawrence v. Texas,* 539 U.S. 558, 578–79, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). Here, it is not the Constitution that has changed, but the knowledge of what it means to be gay or lesbian. The court cannot ignore the fact that the Plaintiffs are able to develop a committed, intimate relationship with a person of the same sex but not with a person of the opposite sex. The court, and the State, must adapt to this changed understanding.

C. *Summary of Due Process Analysis*

The Fourteenth Amendment protects the liberty rights of all citizens, and none of the State's arguments presents a compelling reason why the scope of that right should be greater for heterosexual individuals than it is for gay and lesbian individuals. If, as is clear from the Supreme Court cases discussing the right to marry, a heterosexual person's choices about intimate association and family life are protected from unreasonable government in-

terference in the marital context, then a gay or lesbian person also enjoys these same protections.

The court's holding is supported, even required, by the Supreme Court's recent opinion concerning the scope of protection that the Fourteenth Amendment provides to gay and lesbian citizens. In *Lawrence v. Texas*, the Court overruled its previous decision in *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), and held that the Due Process Clause protected an individual's right to have sexual relations with a partner of the same sex. 539 U.S. at 578, 123 S.Ct. 2472. The Court ruled: "The Texas [sodomy] statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." *Id.* While the Court stated that its opinion did not address "whether the government must give formal recognition to any relationship that homosexual persons seek to enter," *id.,* the Court confirmed that "our laws and tradition afford constitutional protection to personal decisions relating to *marriage,* procreation, contraception, family relationships, child rearing, and education" and held that "[p]ersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do." *Id.* at 574, 123 S.Ct. 2472 (emphasis added). The court therefore agrees with the portion of Justice Scalia's dissenting opinion in *Lawrence* in which Justice Scalia stated that the Court's reasoning logically extends to protect an individual's right to marry a person of the same sex:

Today's opinion dismantles the structure of constitutional law that has permitted a distinction to be made between heterosexual and homosexual unions, insofar as formal recognition in marriage is concerned. If moral disapprobation of homosexual conduct is "no legitimate state interest" for purposes of proscribing that conduct, ... what justification could

there possibly be for denying the benefits of marriage to homosexual couples exercising "the liberty protected by the Constitution"?

*Id.* at 604–05, 123 S.Ct. 2472 (Scalia, J., dissenting) (citations omitted).

The Supreme Court's decision in *Lawrence* removed the only ground—moral disapproval—on which the State could have at one time relied to distinguish the rights of gay and lesbian individuals from the rights of heterosexual individuals. The only other distinction the State has attempted to make is its argument that same-sex couples are not able to naturally reproduce with each other. But, of course, neither can thousands of opposite-sex couples in Utah. As a result, there is no legitimate reason that the rights of gay and lesbian individuals are any different from those of other people. All citizens, regardless of their sexual identity, have a fundamental right to liberty, and this right protects an individual's ability to marry and the intimate choices a person makes about marriage and family.

The court therefore finds that the Plaintiffs have a fundamental right to marry that protects their choice of a same-sex partner.

### D. *Amendment 3 Does Not Survive Strict Scrutiny*

The court's determination that the fundamental right to marry encompasses the Plaintiffs' right to marry a person of the same sex is not the end of the court's analysis. The State may pass a law that restricts a person's fundamental rights provided that the law is "narrowly tailored to serve a compelling state interest." *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). For instance, a state may permissibly regulate the age at which a person may be married because

the state has a compelling interest in protecting children against abuse and coercion. Similarly, a state need not allow an individual to marry if that person is mentally incapable of forming the requisite consent, or if that prohibition is part of the punishment for a prisoner serving a life sentence. *See Butler v. Wilson,* 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974) (summarily affirming decision to uphold a state law that prohibited prisoners incarcerated for life from marrying).

The court finds no reason that the Plaintiffs are comparable to children, the mentally incapable, or life prisoners. Instead, the Plaintiffs are ordinary citizens—business owners, teachers, and doctors—who wish to marry the persons they love. As discussed below, the State of Utah has not demonstrated a rational, much less a compelling, reason why the Plaintiffs should be denied their right to marry. Consequently, the court finds that Amendment 3 violates the Plaintiffs' due process rights under the Fourteenth Amendment.

## V. Amendment 3 Violates the Plaintiffs' Right to Equal Protection

 The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of its laws." U.S. Const. amend. XIV, § 1. The Constitution "neither knows nor tolerates classes among citizens." *Plessy v. Ferguson,* 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting). But the guarantee of equal protection coexists with the practical necessity that most legislation must classify for some purpose or another. *See Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

 To determine whether a piece of legislation violates the Equal Protection Clause, the court first looks to see whether the challenged law implicates a fundamental right. "When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki,* 434 U.S. at 388, 98 S.Ct. 673; *see also Harper v. Va. State Bd. of Elections,* 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) ("We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."). Here, the court finds that Amendment 3 interferes with the exercise of the Plaintiffs' fundamental right to marry. As discussed above, Amendment 3 is therefore unconstitutional because the State has not shown that the law is narrowly tailored to meet a compelling governmental interest. But even if the court disregarded the impact of Amendment 3 on the Plaintiffs' fundamental rights, the law would still fail for the reasons discussed below.

 The Plaintiffs argue that Amendment 3 discriminates against them on the basis of their sex and sexual identity in violation of the Equal Protection Clause. When a state regulation adversely affects members of a certain class, but does not significantly interfere with the fundamental rights of the individuals in that class, courts first determine how closely they should scrutinize the challenged regulation. Courts must not simply defer to the State's judgment when there is reason to suspect "prejudice against discrete and insular minorities ... which tends seriously to curtail the operation of those political processes ordinarily relied upon to protect minorities[.]" *United States v. Carolene Prods. Co.,* 304 U.S.

144, 152–53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

■■■ To decide whether a challenged state law impermissibly discriminates against members of a class in violation of the Equal Protection Clause, the Supreme Court has developed varying tiers of scrutiny that courts apply depending on what class of citizens is affected. "Classifications based on race or national origin" are considered highly suspect and "are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988). On the other end of the spectrum, courts must uphold a legislative classification that does not target a suspect class "so long as it bears a rational relation to some legitimate end." *Romer*, 517 U.S. at 631, 116 S.Ct. 1620. "Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Clark*, 486 U.S. at 461, 108 S.Ct. 1910. Classifications receiving this intermediate level of scrutiny are quasi-suspect classifications that can be sustained only if they are "substantially related to an important governmental objective." *Id.*

### A. *Heightened Scrutiny*

The Plaintiffs assert three theories why the court should apply some form of heightened scrutiny to this case. While the court discusses each of these theories below, it finds that it need not apply heightened scrutiny here because Amendment 3 fails under even the most deferential level of review.

#### 1. *Sex Discrimination*

■■■ The Plaintiffs argue that the court should apply heightened scrutiny to Amendment 3 because it discriminates on the basis of an individual's sex. As noted above, classifications based on sex can be sustained only where the government demonstrates that they are "substantially related" to an "important governmental objective[.]" *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (citation omitted); *Concrete Works v. City of Denver*, 36 F.3d 1513, 1519 (10th Cir.1994) ("Gender-based classifications ... are evaluated under the intermediate scrutiny rubric").

■■■ The State concedes that Amendment 3 involves sex-based classifications because it prohibits a man from marrying another man, but does not prohibit that man from marrying a woman. Nevertheless, the State argues that Amendment 3 does not discriminate on the basis of sex because its prohibition against same-sex marriage applies equally to both men and women. The Supreme Court rejected an analogous argument in *Loving v. Virginia*, 388 U.S. 1, 8–9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). In *Loving*, Virginia argued that its anti-miscegenation laws did not discriminate based on race because the prohibition against mixed-race marriage applied equally to both white and black citizens. *Id.* at 7–8, 87 S.Ct. 1817. The Court found that "the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race." *Id.* at 9, 87 S.Ct. 1817. Applying the same logic, the court finds that the fact of equal application to both men and women does not immunize Utah's Amendment 3 from the heightened burden of justification that the Fourteenth Amendment requires of state laws drawn according to sex.

But because the court finds that Amendment 3 fails rational basis review, it need not analyze why Utah is also unable to satisfy the more rigorous standard of dem-

onstrating an "exceedingly persuasive" justification for its prohibition against same-sex marriage. *Virginia,* 518 U.S. at 533, 116 S.Ct. 2264.

### 2. *Sexual Orientation as a Suspect Class*

The Plaintiffs assert that, even if Amendment 3 does not discriminate on the basis of sex, it is undisputed that the law discriminates on the basis of a person's sexual orientation. The Plaintiffs maintain that gay men and lesbians as a class exhibit the "traditional indicia" that indicate they are especially at risk of discrimination. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The Plaintiffs therefore urge the court to hold that sexual orientation should be considered at least a quasi-suspect class, a holding which would require the court to apply heightened scrutiny to its analysis of Amendment 3.

The court declines to address the Plaintiffs' argument because it finds that it is bound by the Tenth Circuit's discussion of this issue. In *Price–Cornelison v. Brooks,* the Tenth Circuit considered a claim that an undersheriff refused to enforce a protective order because the domestic violence victim was a lesbian. 524 F.3d 1103, 1105 (2008). The court held that the plaintiff's claim did not "implicate a protected class, which would warrant heightened scrutiny." *Id.* at 1113. In a footnote, the court supported its statement with a number of citations to cases from the Tenth Circuit and other Courts of Appeal. *See id.* at 1113 n. 9.

▉ The American Civil Liberties Union submitted an amicus brief arguing that the Tenth Circuit had no occasion to decide whether heightened scrutiny would be appropriate in *Price–Cornelison* because the court found that the discrimination at issue did not survive even rational basis review. *Id.* at 1114. As a result, the

ACLU contends that the Tenth Circuit's statement was dicta and not binding. The court is not persuaded by the ACLU's argument. Even if the Tenth Circuit did not need to reach this question, the court's extensive footnote in *Price–Cornelison* clearly indicates that the Tenth Circuit currently applies only rational basis review to classifications based on sexual orientation. Unless the Supreme Court or the Tenth Circuit hold differently, the court continues to follow this approach.

### 3. *Animus*

▉ The Plaintiffs contend that Amendment 3 is based on animus against gay and lesbian individuals and that the court should therefore apply a heightened level of scrutiny to the law. As discussed below, there is some support for the Plaintiffs' argument in the Supreme Court opinions of *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) and *United States v. Windsor,* ── U.S. ──, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013). But because the Supreme Court has not yet delineated the contours of such an approach, this court will continue to apply the standard rational basis test.

In *Romer,* the Supreme Court considered an amendment to the Colorado Constitution that prohibited any department or agency of the State of Colorado or any Colorado municipality from adopting any law or regulation that would protect gay men, lesbians, or bisexuals from discrimination. 517 U.S. at 624, 116 S.Ct. 1620. The amendment not only prevented future attempts to establish these protections, but also repealed ordinances that had already been adopted by the cities of Denver, Boulder, and Aspen. *Id.* at 623–24, 116 S.Ct. 1620. The Supreme Court held that the amendment was unconstitutional because it violated the Equal Protection Clause. *Id.* at 635, 116 S.Ct. 1620. While

the Court cited the rational basis test, the Court also stated that the Colorado law "confound[ed] this normal process of judicial review." *Id.* at 633, 116 S.Ct. 1620. The Court then held that the law had no rational relation to a legitimate end for two reasons. First, the Court ruled that it was not "within our constitutional tradition" to enact a law "declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government[.]" *Id.* Second, the Court held that "laws of the kind now before us raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id.* at 634, 116 S.Ct. 1620. The Court's analysis focused more on the purpose and effect of the Colorado amendment than on a consideration of the purported legitimate interests the State asserted in support of its law.

The Supreme Court's opinion in *Windsor* is similar. The Court did not analyze the legitimate interests cited by DOMA's defenders as would be typical in a rational basis review. *See Windsor*, 133 S.Ct. at 2707 (Scalia, J., dissenting) ("[The majority] makes only a passing mention of the 'arguments put forward' by the Act's defenders, and does not even trouble to paraphrase or describe them."). Instead, the Court focused on the "design, purpose, and effect of DOMA," *id.* at 2689, and held that the law's "avowed purpose and practical effect" was "to impose a disadvantage, a separate status, and so a stigma" on same-sex couples that a state had permitted to wed. *Id.* at 2693. Because DOMA's "principal purpose" was "to impose inequality," *id.* at 2694, the Court ruled that the law deprived legally wed same-sex couples of "an essential part of the liberty protected by the Fifth Amendment." *Id.* at 2692.

In both *Romer* and *Windsor*, the Court cited the following statement from *Louisville Gas & Elec. Co. v. Coleman:* "Discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." 277 U.S. 32, 37–38, 48 S.Ct. 423, 72 L.Ed. 770 (1928), *quoted in Romer*, 517 U.S. at 633, 116 S.Ct. 1620. Indeed, the *Windsor* Court held that "discriminations of an unusual character especially *require* careful consideration." 133 S.Ct. at 2693 (emphasis added) (citation omitted). The Court's emphasis on discriminations of an unusual character suggests that, when presented with an equal protection challenge, courts should first analyze the law's design, purpose, and effect to determine whether the law is subject to "careful consideration." If the principal purpose or effect of a law is to impose inequality, a court need not even consider whether the class of citizens that the law effects requires heightened scrutiny or a rational basis approach. Such laws are "not within our constitutional tradition," *Romer*, 517 U.S. at 633, 116 S.Ct. 1620, and violate the Equal Protection Clause regardless of the class of citizens that bears the disabilities imposed by the law. If, on the other hand, the law merely distributes benefits unevenly, then the law is subject to heightened scrutiny only if the disadvantages imposed by that law are borne by a class of people that has a history of oppression and political powerlessness.

While this analysis appears to follow the Supreme Court's reasoning in *Romer* and *Windsor*, the court is wary of adopting such an approach here in the absence of more explicit guidance. For instance, the Supreme Court has not elaborated how a court should determine whether a law imposes a discrimination of an unusual character. There are a number of reasons

why Amendment 3 is similar to both DOMA and the Colorado amendment that the Supreme Court struck down in *Windsor* and *Romer.* First, the avowed purpose and practical effect of Amendment 3 is to deny the responsibilities and benefits of marriage to same-sex couples, which is another way of saying that the law imposes inequality. Indeed, Amendment 3 went beyond denying gay and lesbian individuals the right to marry and held that no domestic union could be given the same or substantially equivalent legal effect as marriage. This wording suggests that the imposition of inequality was not merely the law's effect, but its goal.

Second, Amendment 3 has an unusual character when viewed within the historical context in which it was passed. Even though Utah already had statutory provisions that restricted marriage to opposite-sex couples, the State nevertheless passed a constitutional amendment to codify this prohibition. This action is only logical when viewed against the developments in Massachusetts, whose Supreme Court held in 2003 that the Massachusetts Constitution required the recognition of same-sex marriages. *Goodridge v. Dep't of Pub. Health,* 440 Mass. 309, 798 N.E.2d 941, 948 (2003). The Utah legislature believed that a constitutional amendment was necessary to maintain Utah's ban on same-sex marriage because of the possibility that a Utah court would adopt reasoning similar to the Massachusetts Supreme Court and hold that the Utah Constitution already protected an individual's right to marry a same-sex partner. Amendment 3 thereby preemptively denied rights to gay and lesbian citizens of Utah that they may have already had under the Utah Constitution.

But there are also reasons why Amendment 3 may be distinguishable from the laws the Supreme Court has previously held to be discriminations of an unusual character. Most notably, the Court has not articulated to what extent such a discrimination must be motivated by a "bare ... desire to harm a politically unpopular group." *U.S. Dep't of Agric. v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). The Plaintiffs argue that Amendment 3 was motivated by animus and urge the court to consider the statements in the Voter Information Pamphlet that was provided to Utah voters. The Pamphlet includes arguments made by Amendment 3's proponents that the amendment was necessary to "maintain[ ] public morality" and to ensure the continuation of "the ideal relationship where men, women and children thrive best." (Utah Voter Information Pamphlet to General Election on Nov. 2, 2004, at 36, Dkt. 32–2.) The Plaintiffs submit that these statements demonstrate that Amendment 3 was adopted to further privately held moral views that same-sex couples are immoral and inferior to opposite-sex couples.

While the Plaintiffs argue that many Utah citizens voted for Amendment 3 out of a dislike of gay and lesbian individuals, the court finds that it is impossible to determine what was in the mind of each individual voter. Some citizens may have voted for Amendment 3 purely out of a belief that the amendment would protect the benefits of opposite-sex marriage. Of course, good intentions do not save a law if the law bears no rational connection to its stated legitimate interests, but this analysis is the test the court applies when it follows the Supreme Court's rational basis jurisprudence. It is unclear how a mix of animus and good intentions affects the determination of whether a law imposes a discrimination of such unusual character that it requires the court to give it careful consideration.

In any event, the theory of heightened scrutiny that the Plaintiffs advocate is not

necessary to the court's determination of Amendment 3's constitutionality. The court has already held that Amendment 3 burdens the Plaintiffs' fundamental right to marriage and is therefore subject to strict scrutiny. And, as discussed below, the court finds that Amendment 3 bears no rational relationship to any legitimate state interests and therefore fails rational basis review. It may be that some laws neither burden a fundamental right nor target a suspect class, but nevertheless impose a discrimination of such unusual character that a court must review a challenge to such a law with careful consideration. But the court's analysis here does not hinge on that type of heightened review. The court therefore proceeds to apply the well-settled rational basis test to Amendment 3.

### B. Rational Basis Review

When a law creates a classification but does not target a suspect class or burden a fundamental right, the court presumes the law is valid and will uphold it so long as it rationally relates to some legitimate governmental purpose. *See Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). The court defers to the judgment of the legislature or the judgment of the people who have spoken through a referendum if there is at least a debatable question whether the underlying basis for the classification is rational. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). But even under the most deferential standard of review, the court must still "insist on knowing the relation between the classification adopted and the object to be obtained." *Romer v. Evans,* 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *Lyng v. Int'l Union,* 485 U.S. 360, 375, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988) ("[L]egislative enactments must implicate legitimate goals, and the means chosen by the legisla-

ture must bear a rational relationship to those goals."). This search for a rational relationship "ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer,* 517 U.S. at 633, 116 S.Ct. 1620. As a result, a law must do more than disadvantage or otherwise harm a particular group to survive rational basis review. *See U.S. Dep't of Agric. v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

The State emphasizes that the court must accept any legislative generalizations, "even when there is an imperfect fit between means and ends." *Heller,* 509 U.S. at 321, 113 S.Ct. 2637. The court will uphold a classification provided "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not." *Johnson v. Robison,* 415 U.S. 361, 383, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). Based on this principle, the State argues that its extension of marriage benefits to opposite-sex couples promotes certain governmental interests such as responsible procreation and optimal child-rearing that would not be furthered if marriage benefits were extended to same-sex couples. But the State poses the wrong question. The court's focus is not on whether extending marriage benefits to heterosexual couples serves a legitimate governmental interest. No one disputes that marriage benefits serve not just legitimate, but compelling governmental interests, which is why the Constitution provides such protection to an individual's fundamental right to marry. Instead, courts are required to determine whether there is a rational connection between the challenged statute and a legitimate state interest. Here, the challenged statute does not grant marriage benefits to opposite-sex couples. The effect of Amendment 3 is only to disallow same-sex couples

from gaining access to these benefits. The court must therefore analyze whether the State's interests in responsible procreation and optimal child-rearing are furthered by prohibiting same-sex couples from marrying.

This focus on a rational connection between the State's legitimate interests and the State's exclusion of a group from benefits is well-supported in a number of Supreme Court decisions. For instance, the Court held in *Johnson v. Robison* that the rational basis test was satisfied by a congressional decision to exclude conscientious objectors from receiving veterans' tax benefits because their lives had not been disrupted to the same extent as the lives of active service veterans. 415 U.S. at 381–82, 94 S.Ct. 1160. *See also City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 448–50, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (examining the city's interest in denying housing for people with developmental disabilities, not in continuing to allow residence for others); *Moreno*, 413 U.S. at 535–38, 93 S.Ct. 2821 (testing the federal government's interest in excluding unrelated households from food stamp benefits, not in maintaining food stamps for related households); *Eisenstadt v. Baird*, 405 U.S. 438, 448–53, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (requiring a state interest in the exclusion of unmarried couples from lawful access to contraception, not merely an interest in continuing to allow married couples access); *Loving v. Virginia*, 388 U.S. 1, 9–12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (examining whether Virginia's exclusion of interracial couples from marriage violated equal protection principles independent of Virginia's interest in providing marriage to same-race couples).

For the reasons stated below, the court finds that the legitimate government interests that Utah cites are not rationally related to Utah's prohibition of same-sex marriage.

### 1. *Responsible Procreation*

The State argues that the exclusion of same-sex couples from marriage is justified based on an interest in promoting responsible procreation within marriage. According to the State, "[t]raditional marriage with its accompanying governmental benefits provides an incentive for opposite-sex couples to commit together to form [ ] a stable family in which their planned, and especially unplanned, biological children may be raised." (Defs.' Mot. Summ. J., at 28, Dkt. 33.) The Plaintiffs do not dispute the State's assertion, but question how disallowing same-sex marriage has any effect on the percentage of opposite-sex couples that have children within a marriage. The State has presented no evidence that the number of opposite-sex couples choosing to marry each other is likely to be affected in any way by the ability of same-sex couples to marry. Indeed, it defies reason to conclude that allowing same-sex couples to marry will diminish the example that married opposite-sex couples set for their unmarried counterparts. Both opposite-sex and same-sex couples model the formation of committed, exclusive relationships, and both establish families based on mutual love and support. If there is any connection between same-sex marriage and responsible procreation, the relationship is likely to be the opposite of what the State suggests. Because Amendment 3 does not currently permit same-sex couples to engage in sexual activity within a marriage, the State reinforces a norm that sexual activity may take place outside the marriage relationship.

As a result, any relationship between Amendment 3 and the State's interest in responsible procreation "is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at

446, 105 S.Ct. 3249; *see also Perry v. Schwarzenegger,* 704 F.Supp.2d 921, 972 (N.D.Cal.2010) ("Permitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriage."). Accordingly, the court finds no rational connection between Amendment 3 and the state's interest in encouraging its citizens to engage in responsible procreation.

### 2. *Optimal Child–Rearing*

The State also asserts that prohibiting same-sex couples from marrying "promotes the ideal that children born within a state-sanctioned marriage will be raised by both a mother and father in a stable family unit." (Defs.' Mot. Summ. J., at 33, Dkt. 33.) Utah contends that the "gold standard" for family life is an intact, biological, married family. (*Id.* at 34.) By providing incentives for only opposite-sex marriage, Utah asserts that more children will be raised in this ideal setting. The Plaintiffs dispute the State's argument that children do better when raised by opposite-sex parents than by same-sex parents. The Plaintiffs claim that the State's position is demeaning not only to children of same-sex parents, but also to adopted children of opposite-sex parents, children of single parents, and other children living in families that do not meet the State's "gold standard." Both parties have cited numerous authorities to support their positions. To the extent the parties have created a factual dispute about the optimal environment for children, the court cannot resolve this dispute on motions for summary judgment. But the court need not engage in this debate because the State's argument is unpersuasive for another reason. Once again, the State fails to demonstrate any rational link between its prohibition of same-sex marriage and its goal of having more children raised in the family structure the State wishes to promote.

There is no reason to believe that Amendment 3 has any effect on the choices of couples to have or raise children, whether they are opposite-sex couples or same-sex couples. The State has presented no evidence that Amendment 3 furthers or restricts the ability of gay men and lesbians to adopt children, to have children through surrogacy or artificial insemination, or to take care of children that are biologically their own whom they may have had with an opposite-sex partner. Similarly, the State has presented no evidence that opposite-sex couples will base their decisions about having children on the ability of same-sex couples to marry. To the extent the State wishes to see more children in opposite-sex families, its goals are tied to laws concerning adoption and surrogacy, not marriage.

If anything, the State's prohibition of same-sex marriage detracts from the State's goal of promoting optimal environments for children. The State does not contest the Plaintiffs' assertion that roughly 3,000 children are currently being raised by same-sex couples in Utah. (Patterson Decl. ¶ 40, Dkt. 85.) These children are also worthy of the State's protection, yet Amendment 3 harms them for the same reasons that the Supreme Court found that DOMA harmed the children of same-sex couples. Amendment 3 "humiliates [ ] thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Windsor,* 133 S.Ct. at 2694. Amendment 3 "also brings financial harm to children of same-sex couples," *id.* at 2695, because it denies the families of

these children a panoply of benefits that the State and the federal government offer to families who are legally wed. Finally, Utah's prohibition of same-sex marriage further injures the children of both opposite-sex and same-sex couples who themselves are gay or lesbian, and who will grow up with the knowledge that the State does not believe they are as capable of creating a family as their heterosexual friends.

For these reasons, Amendment 3 does not make it any more likely that children will be raised by opposite-sex parents. As a result, the court finds that there is no rational connection between Utah's prohibition of same-sex marriage and its goal of fostering an ideal family environment for a child.

### 3. *Proceeding with Caution*

 The State contends that it has a legitimate interest in proceeding with caution when considering expanding marriage to encompass same-sex couples. But the State is not able to cite any evidence to justify its fears. The State's argument is analogous to the City of Cleburne's position in *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In that case, the City was concerned about issuing a permit for a home for the developmentally disadvantaged because of the fears of the property owners near the facility. *Id.* at 448, 105 S.Ct. 3249. The Supreme Court held that "mere negative attitudes, or fear, . . . are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like." *Id.* The State can plead an interest in proceeding with caution in almost any setting. If the court were to accept the State's argument here, it would turn the rational basis analysis into a toothless and perfunctory review.

In any event, the only evidence that either party submitted concerning the effect of same-sex marriage suggests that the State's fears are unfounded. In an amicus brief submitted to the Ninth Circuit Court of Appeals by the District of Columbia and fourteen states that currently permit same-sex marriage, the states assert that the implementation of same-sex unions in their jurisdictions has not resulted in any decrease in opposite-sex marriage rates, any increase in divorce rates, or any increase in the number of nonmarital births. (Brief of State Amici in *Sevcik v. Sandoval,* at 24–28, Ex. 13 to Pls.' Mem. in Opp'n, Dkt. 85–14.) In addition, the process of allowing same-sex marriage is straightforward and requires no change to state tax, divorce, or inheritance laws.

For these reasons, the court finds that proceeding with caution is not a legitimate state interest sufficient to survive rational basis review.

### 4. *Preserving the Traditional Definition of Marriage*

 As noted in the court's discussion of fundamental rights, the State argues that preserving the traditional definition of marriage is itself a legitimate state interest. But tradition alone cannot form a rational basis for a law. *Williams v. Illinois,* 399 U.S. 235, 239, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970) ("[N]either the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack"); *see also Heller v. Doe,* 509 U.S. 312, 326, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ("Ancient lineage of a legal concept does not give it immunity from attack for lacking a rational basis.").

 The traditional view of marriage has in the past included certain views about race and gender roles that were insufficient to uphold laws based on these views. *See Lawrence v. Texas,* 539 U.S.

558, 577–78, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack") (citation omitted); *Nevada Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 733–35, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) (finding that government action based on stereotypes about women's greater suitability or inclination to assume primary childcare responsibility was unconstitutional). And, as Justice Scalia has noted in dissent, " 'preserving the traditional institution of marriage' is just a kinder way of describing the State's *moral disapproval* of same-sex couples." *Lawrence,* 539 U.S. at 601, 123 S.Ct. 2472 (Scalia, J., dissenting). While "[p]rivate biases may be outside the reach of the law, . . . the law cannot, directly or indirectly, give them effect" at the expense of a disfavored group's constitutional rights. *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984).

Although the State did not directly present an argument based on religious freedom, the court notes that its decision does not mandate any change for religious institutions, which may continue to express their own moral viewpoints and define their own traditions about marriage. If anything, the recognition of same-sex marriage expands religious freedom because some churches that have congregations in Utah desire to perform same-sex wedding ceremonies but are currently unable to do so. *See* Brief of Amici Curiae Bishops et al., at 8–15, *United States v. Windsor,* —— U.S. ——, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013) (No. 12–307) (arguing that the inherent dignity of lesbian and gay individuals informs the theology of numerous religious beliefs, including the Unitarian Universalist Church and the United Church of Christ). By recognizing the right to marry a partner of the same sex, the State allows these groups the freedom to practice their religious beliefs

without mandating that other groups must adopt similar practices.

For these reasons, the court finds that the State's interest in preserving its traditional definition of marriage is not sufficient to survive rational basis review.

### C. *Summary of Rational Basis Analysis*

In its briefing and at oral argument, the State was unable to articulate a specific connection between its prohibition of same-sex marriage and any of its stated legitimate interests. At most, the State asserted: "We just simply don't know." (Hr'g Tr., at 94, 97, Dec. 4, 2013, Dkt. 88.) This argument is not persuasive. The State's position appears to be based on an assumption that the availability of same-sex marriage will somehow cause opposite-sex couples to forego marriage. But the State has not presented any evidence that heterosexual individuals will be any less inclined to enter into an opposite-sex marriage simply because their gay and lesbian fellow citizens are able to enter into a same-sex union. Similarly, the State has not shown any effect of the availability of same-sex marriage on the number of children raised by either opposite-sex or same-sex partners.

In contrast to the State's speculative concerns, the harm experienced by same-sex couples in Utah as a result of their inability to marry is undisputed. To apply the Supreme Court's reasoning in *Windsor,* Amendment 3 "tells those couples, and all the world, that their otherwise valid [relationships] are unworthy of [state] recognition. This places same-sex couples in an unstable position of being in a second-tier [relationship]. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects." *Windsor,* 133 S.Ct. at 2694; *see also id.* at 2710

(Scalia, J., dissenting) (suggesting that the majority's reasoning could be applied to the state-law context in precisely this way). And while Amendment 3 does not offer any additional protection to children being raised by opposite-sex couples, it demeans the children of same-sex couples who are told that their families are less worthy of protection than other families.

The Plaintiffs have presented a number of compelling arguments demonstrating that the court should be more skeptical of Amendment 3 than of typical legislation. The law differentiates on the basis of sex and closely resembles the type of law containing discrimination of an unusual character that the Supreme Court struck down in *Romer* and *Windsor.* But even without applying heightened scrutiny to Amendment 3, the court finds that the law discriminates on the basis of sexual identity without a rational reason to do so. Because Amendment 3 fails even rational basis review, the court finds that Utah's prohibition on same-sex marriage violates the Plaintiffs' right to equal protection under the law.

## VI. Utah's Duty to Recognize a Marriage Validly Performed in Another State

Plaintiffs Karen Archer and Kate Call contend that their rights to due process and equal protection are further infringed by the State's refusal to recognize their marriage that was validly performed in Iowa. The court's disposition of the other issues in this lawsuit renders this question moot. Utah's current laws violate the rights of same-sex couples who were married elsewhere not because they discriminate against a subsection of same-sex couples in Utah who were validly married in another state, but because they discriminate against all same-sex couples in Utah.

## CONCLUSION

In 1966, attorneys for the State of Virginia made the following arguments to the Supreme Court in support of Virginia's law prohibiting interracial marriage: (1) "The Virginia statutes here under attack reflects [sic] a policy which has obtained in this Commonwealth for over two centuries and which still obtains in seventeen states"; (2) "Inasmuch as we have already noted the higher rate of divorce among the intermarried, is it not proper to ask, 'Shall we then add to the number of children who become the victims of their intermarried parents?'"; (3) "[I]ntermarriage constitutes a threat to society"; and (4) "[U]nder the Constitution the regulation and control of marital and family relationships are reserved to the States." Brief for Respondents at 47–52, *Loving v. Virginia,* 388 U.S. 1 (1967), 1967 WL 113931. These contentions are almost identical to the assertions made by the State of Utah in support of Utah's laws prohibiting same-sex marriage. For the reasons discussed above, the court finds these arguments as unpersuasive as the Supreme Court found them fifty years ago. Anti-miscegenation laws in Virginia and elsewhere were designed to, and did, deprive a targeted minority of the full measure of human dignity and liberty by denying them the freedom to marry the partner of their choice. Utah's Amendment 3 achieves the same result.

Rather than protecting or supporting the families of opposite-sex couples, Amendment 3 perpetuates inequality by holding that the families and relationships of same-sex couples are not now, nor ever will be, worthy of recognition. Amendment 3 does not thereby elevate the status of opposite-sex marriage; it merely demeans the dignity of same-sex couples. And while the State cites an interest in protecting traditional marriage, it protects

that interest by denying one of the most traditional aspects of marriage to thousands of its citizens: the right to form a family that is strengthened by a partnership based on love, intimacy, and shared responsibilities. The Plaintiffs' desire to publicly declare their vows of commitment and support to each other is a testament to the strength of marriage in society, not a sign that, by opening its doors to all individuals, it is in danger of collapse.

The State of Utah has provided no evidence that opposite-sex marriage will be affected in any way by same-sex marriage. In the absence of such evidence, the State's unsupported fears and speculations are insufficient to justify the State's refusal to dignify the family relationships of its gay and lesbian citizens. Moreover, the Constitution protects the Plaintiffs' fundamental rights, which include the right to marry and the right to have that marriage recognized by their government. These rights would be meaningless if the Constitution did not also prevent the government from interfering with the intensely personal choices an individual makes when that person decides to make a solemn commitment to another human being. The Constitution therefore protects the choice of one's partner for all citizens, regardless of their sexual identity.

## ORDER

The court GRANTS the Plaintiffs' Motion for Summary Judgment (Dkt. 32) and DENIES the Defendants' Motion for Summary Judgment (Dkt. 33). The court hereby declares that Amendment 3 is unconstitutional because it denies the Plaintiffs their rights to due process and equal protection under the Fourteenth Amendment of the United States Constitution. The court hereby enjoins the State from enforcing Sections 30–1–2 and 30–1–4.1 of the Utah Code and Article I, § 29 of the Utah Constitution to the extent these laws prohibit a person from marrying another person of the same sex.